### UNITED STATES of America

v.

**Ramzi Ahmed YOUSEF, a/k/a "Azan Muhammad," a/k/a "Khurram Khan," a/k/a "Rashed," a/k/a "Kamal Ibraham," a/k/a "Abdul Basit," a/k/a "Adam Ali Qasim," a/k/a "Naji Haddad," a/k/a "Dr. Paul Vijay," a/k/a "Dr. Adel Sabah," a/k/a "Amaldo Forlani," a/k/a "Muhammed Ali Baloch," Abdul Hakim Murad, a/k/a "Saeed Ahmed," Wali Khan Amin Shah, a/k/a "Grabi Ibrahim Hahsen," a/k/a "Osama Turkestani," Defendants.**

**No. S12 93 Cr. 180 (KTD).**

United States District Court, S.D. New York.

May 29, 1996.

Clover M. Barrett, New York City, for Defendant Abdul Hakim Murad; Bernard Udell, of Counsel.

David S. Greenfield, New York City, for Defendant Wali Khan Amin Shah; Bennett Epstein, of Counsel.

Mary Jo White, United States Attorney, Southern District of New York, New York City, for United States; J. Gilmore Childers, Dietrich L. Snell, Michael J. Garcia, Assistant United States Attorneys, of Counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Defendants, Ramzi Ahmed Yousef, ("Yousef"), Abdul Hakim Murad ("Murad"), and Wali Khan Amin Shah, ("Shah"), are charged with conspiring and attempting to damage, destroy and bomb numerous United States commercial airliners operating in East Asia routes, all but one of which had some United States city as a scheduled stop. Defendants are also alleged to have been responsible for the detonation of a bomb in the Greenbelt Theater in Manila, Philippines, on or about December 1, 1994. Defendant Yousef is charged with the detonation of another bomb on December 11, 1994, aboard Philippine Airlines Flight 434 bound for Tokyo, Japan, which exploded while the airplane was in flight, causing the death of one passenger, Haruki Ikegami, and injuring several others. Both of these explosions are included as overt acts in the conspiracy to blow up the United States airliners, and the explosion aboard the Philippines airliner is charged as a separate count in the indictment.

The specific violations with which these Defendants are charged include: conspiring and attempting to destroy aircraft in foreign air commerce within the special aircraft jurisdiction of the United States, in violation of 18 U.S.C. §§ 32(a)(1), (2), (7), and 371 (Counts Twelve, Thirteen and Fourteen); conspiring to kill a national of the United States with malice aforethought, in violation of 18 U.S.C. § 2332(b) and (d) (Count Fifteen); conspiring to use a weapon of mass destruction in relation to the conspiracy

Roy R. Kulcsar, New York City, for Defendant Ramzi Ahmed Yousef; Gail E. Laser, of Counsel.

charged in Count Fifteen of the indictment in violation of 18 U.S.C. § 2332a (Count Sixteen); using and carrying an improvised explosive device in relation to the conspiracy charged in Counts Twelve and Fifteen, in violation of 18 U.S.C. § 924(c) and 2 (Counts Seventeen and Eighteen); Defendant Yousef is charged with placing and causing the detonation of a bomb aboard a Philippines airliner, in violation of 18 U.S.C. § 32(b) (Count Nineteen); and finally, Defendant Shah is charged with attempting to escape from the custody of the United States in violation of 18 U.S.C. § 751(a) (Count Twenty).

All three Defendants have made various pretrial motions. Yousef moves for (1) dismissal of the indictment because of the alleged mistreatment he suffered while in the custody of unidentified individuals in Pakistan and Pakistani law enforcement agents; (2) dismissal of Count Nineteen of the Indictment, which charges the unlawful placing of a bomb aboard a Philippines airliner, based on jurisdictional "principles of both domestic and international law."

Defendant Murad also moves for dismissal of the indictment for lack of jurisdiction, arguing that the charged offenses did not occur in the "special aircraft jurisdiction" of the United States and that the indictment does not specify the particular United States citizens or property which were the target of the alleged conspiracy.

Defendant Shah moves for dismissal of the indictment alleging that the prosecution of a non-citizen for these extraterritorial crimes in the United States violates the Fifth and Sixth Amendments of the United States Constitution, federal statutory law, and provisions of international law and extradition treaties to which the United States is a party.

For the following reasons, Defendants' motions are denied.

*Yousef's Motion to Dismiss the Indictment*

■ Yousef argues that his abduction in Pakistan and the United States' direction of or acquiescence in his alleged torture and interrogation warrant dismissal of the indictment based on the Second Circuit decision in *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974). Yousef argues that under the holding in *Toscanino,* jurisdiction over him was acquired as a result of a deliberate, unnecessary and unreasonable invasion of his rights. However, contrary to Yousef's arguments, *Toscanino* does not stand for the proposition that such allegations must result in dismissal of an indictment. *See United States ex rel. Lujan v. Gengler,* 510 F.2d 62, 66 (2d Cir.1975) (absent a set of incidents like that posited by the Court of Appeals as being present in *Toscanino,* not every violation by prosecution or police is so egregious that it requires nullification of the indictment).

The court in *Toscanino* merely remanded to the District Court for an evidentiary hearing to be held only if the defendant "offers some credible supporting evidence, including specifically evidence that the action was taken by or at the direction of United States officials." *Id.* at 281. On remand, Toscanino's only evidence of his torture and coercive interrogation was his own affidavit, which failed to show participation by United States officials. The trial court, therefore refused to hold an evidentiary hearing and denied the motion to vacate the conviction and dismiss the indictment. *See United States v. Toscanino,* 398 F.Supp. 916, 917 (E.D.N.Y.1975).

Like the trial court in the original case, subsequent courts have interpreted the Second Circuit decision in *Toscanino* narrowly, and generally have refused to dismiss indictments either because of the defendant's failure to establish abusive activity or the defendant's failure to establish United States involvement in the offensive conduct. *See United States v. Yunis,* 681 F.Supp. 909, 919 (D.D.C.1988) ("Although most circuits have acknowledged the exception carved out by *Toscanino,* it is highly significant that *no* court has ever applied it to dismiss an indictment.") (emphasis in original).[1]

---

1. Indeed, in one of the few reported cases to actually hold a hearing to evaluate allegations of torture in a foreign country with regard to a motion to dismiss an indictment, the district court in *United States v. Orsini,* 402 F.Supp. 1218 (E.D.N.Y.1975), stated that a hearing was appropriate in that case since the defendant's sworn affidavit specifically alleged that United States agents had kidnapped, beaten, and drugged him. *Id.* at 1218–19. As discussed below, Yousef's

Yousef has failed to meet the requirements of *Toscanino.* Yousef's affidavit does not sufficiently allege that United States agents participated in his alleged abduction and torture in Pakistan. In his affidavit in support of this motion, Yousef alleges that he was subject to months of torture at the hands of unidentified individuals in Pakistan who were somehow under the direction of United States officials. Yousef maintains that he was abducted from his relatives' home in Pakistan sometime at the end of November 1994, and remained in the custody of these original abductors and other Pakistan officials until he was surrendered to United States law enforcement agents on February 8, 1995. It was during these months that Yousef allegedly suffered the torture.

Yousef maintains that a United States official was present during a period of his interrogation when he was taken to a desert jail cell in Pakistan some days after his alleged abduction, but before his arrest and surrender to United States officials in Islamabad on February 8, 1995. (Yousef Aff. ¶ 23). According to Yousef, the torture which he suffered while in the desert consisted of forced intake of drugs to keep him awake and the denial of rest except at meal times. Yousef does not claim that he was tortured or otherwise mistreated during his period of custody in Islamabad, from February 7 to February 8, 1995, or after his transfer to United States agents.

Yousef's allegations of a period of over two months of torture appear incredible, given that there is no record of his arrest by anyone until February 7, 1995 in Islamabad. Additionally, a passport issued in the name of "Ali Muhammad Baloch"[2], with Yousef's picture, was found in Yousef's possession at the time of his arrest and contained date stamps that tend to show that Yousef departed Pakistan on January 31, 1995, entered Bangkok, Thailand on February 1, 1995 and departed Bangkok on February 5, 1995. (Garrett Aff., Ex. 5). This passport, therefore, belies his claim that he was in custody in Pakistan

between the period of November 1994 and February 7, 1995.

Yousef does not allege a sufficient factual basis for his assertion that a United States official was present during his alleged torture. Yousef alleges that he heard English being spoken during the desert interrogation and that he later recognized the voice as belonging to an FBI agent who questioned him in Islamabad as the same FBI agent who participated in the desert interrogation with unidentified Pakistanis. (Yousef Aff. ¶ 31). Yousef has not identified which FBI agent's voice he now claims he recognized as the one present in the desert. Nor has he stated what role this FBI agent played in the alleged torture.

Two FBI agents did in fact question Yousef in Islamabad. However, these agents, Legal Attache Ralph Paul Horton and Special Agent Bradley J. Garret, were not in Pakistan until February 4, 1995 and February 7, 1995 respectively. (Horton Aff. ¶ 4); (Garrett Aff. ¶ 4). Moreover, according to Legal Attache Horton, who at the time was responsible for all FBI personnel entering Pakistan, no FBI agent was in Pakistan investigating the Yousef matter during this period prior to his arrival. (Horton Aff. ¶ 3).

In *United States v. Lira,* 515 F.2d 68 (2d Cir.), *cert. denied,* 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975), the Circuit Court affirmed the denial of a motion to dismiss an indictment where the defendant's allegations of United States involvement were based on the defendant's overhearing English being spoken during his interrogation. The District Court held that the defendant's allegations were not sufficient "evidence that American agents were present at or privy to [defendant's] interrogation or that the persons overheard to speak English were Americans, much less Government agents." *Id.* at 71.

Since no FBI agent was in Pakistan during the period of alleged torture, Yousef's allegations of voice recognition appear to be baseless and do not allege sufficient United

---

allegations of United States involvement are not sufficiently credible so as to require a hearing.

**2.** Baloch is an acknowledged alias of Yousef, as evidenced by Yousef's own use of this name in signing a rights waiver form. (Laser Aff., Ex. C).

States involvement under *Toscanino* and *Lira.*

■ Moreover, the United States request for Yousef's extradition is not sufficient United States involvement to warrant a dismissal of the indictment. As stated in *Lira,* "[t]he DEA can hardly be expected to monitor the conduct of representatives of each foreign government to assure that a request for extradition or expulsion is carried out in accordance with American constitutional standards." 515 F.2d at 71. This same principle must apply to other United States law enforcement agencies as well. Thus, a request to extradite is not sufficient United States involvement to warrant dismissal of the indictment. *See id.*

Yousef's motion to dismiss the indictment because of the United States involvement in the alleged torture suffered while in Pakistan is denied.

*Extraterritorial Jurisdiction*

■ Each Defendant has made various arguments as to why this court should not exercise extraterritorial jurisdiction over the crimes charged in the Indictment. All Defendants argue that this court does not have subject matter jurisdiction to try them for the conspiracy or the attempt to blow up United States civil aircraft in the "special aircraft jurisdiction" of the United States in violation of 18 U.S.C. §§ 32(a)(1), (2), (7) and 371 (Counts Twelve, Thirteen and Fourteen). Defendant Yousef challenges jurisdiction for the actual bombing of the Philippine aircraft in violation of 18 U.S.C. § 32(b) (Count Nineteen). All Defendants also attack the propriety of any other count which relies on these counts.

Defendants' various jurisdictional arguments rely on either constitutional due process principles, statutory interpretation and other domestic law, or international law. While the form of each Defendants' argument differs, in substance each Defendant challenges the assertion of extraterritorial jurisdiction by United States courts where the offenses charged did not occur on United States soil, did not involve United States citizens as defendants, or did not result in the death or injury of a United States citizen.

(Yousef 11/1/95 Br. at 14–15; Murad Br. at 6; Shah Br. at 4–5; 9–10).

Jurisdiction is based primarily on Section 32 of Title 18, which states in relevant part:

(a) Whoever willfully—

(1) sets fire to, damages, destroys, disables, or wrecks any aircraft in the special aircraft jurisdiction of the United States or any civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce;

(2) places or causes to be placed a destructive device or substance in, upon, or in proximity to, or otherwise makes or causes to be made unworkable or unusable or hazardous to work or use, any such aircraft, or any part or other materials used or intended to be used in connection with the operation of such aircraft, if such placing or causing to be placed or such making or causing to be made is likely to endanger the safety of any such aircraft; . . .

(7) attempts to do anything prohibited under paragraphs (1) through (6) of this subsection;

shall be fined under this title or imprisoned not more than twenty years, or both.

(b) Whoever wilfully—

(3) places or causes to be placed on a civil aircraft registered in a country other than the United States while such aircraft is in service, a device or substance which is likely to destroy that aircraft, or to cause damage to that aircraft which renders that aircraft incapable of flight or which is likely to endanger that aircraft's safety in flight; . . .

shall, if the offender is later found in the United States, be fined under this title or imprisoned not more than twenty years, or both.

Defendants have been charged under Section 32(a)(1), (2), and (7) in conjunction with the federal conspiracy statute, 18 U.S.C. § 371, with conspiring to bomb eleven United States airliners operating in East Asia. Defendant Yousef has also been charged in a separate count for violation of section 32(b)(3) for the actual bombing of the Philippines airliner. Had the prosecution for

the Philippines airliner bombing been brought separately, the argument that "this case has far more nexus to the Philippines than it does to the United States" (Shah Br. at 9), may have been more persuasive. However, this prosecution alleges that the Philippines airliner bombing was just one step in the overall plot to sabotage United States airliners. As such, the Philippines airliner bombing is alleged to have been part of Defendants' continuous course of conduct in relation to the overall bombing plot. Correctly construed, therefore, it becomes apparent that this court has the authority to assert extraterritorial jurisdiction over the three Defendants for the crimes charged in this indictment consistent with the statutory jurisdictional requirements of Section 32, principles of international law, and the United States Constitution. Not only does this court have the authority to exercise extraterritorial jurisdiction in this case, but, under treaty obligations of the United States, it is required to do so.

Section 32, adopted as part of the Aircraft Sabotage Act, was enacted in 1984 to fulfill this country's responsibilities under the Montreal Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, ("the Montreal Convention"), 24 U.S.T. 565, T.I.A.S. 7570, which came into effect on January 26, 1973. Senate Report No. 619, 98th Cong., 2d Sess. 1 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News at 3682. A principal purpose of the act was to provide federal jurisdiction over individuals who were accused of committing crimes involving aircraft sabotage and over whom the courts would not otherwise have jurisdiction under domestic law. *See* Section 2012 of Pub.L. 98–473 (the Montreal Convention "requires each contracting State to establish its jurisdiction over certain offenses affecting the safety of civil aviation; ... the purpose of this subtitle is to implement fully the [Montreal Convention] and to expand the protection accorded to aircraft and related facilities"); *see also* Restatement (Third) of the Foreign Relations Law of the United States ("Restatement (Third)") (1987), § 404, Reporter's Note 1 (the Montreal Convention "include[s] an obligation on the parties to punish or extradite offenders, even when the offense was not committed within their territory or by a national.")

Murad argues that Counts Twelve through Fourteen, which charge the plot to blow up United States airliners do not satisfy the jurisdictional requirements of Section 32(a) because the indictment fails to specify a particular United States aircraft which was the subject of the alleged conspiracy, and therefore does not satisfy the statutory jurisdictional requirements. (Murad Br. ¶ 13).

Traditional notions of jurisdiction provided that a country's jurisdiction extended internationally over vessels or aircraft flying that country's flag based on a "floating or flying territory" rationale. *See* Restatement (Third) § 402, Reporter's Note 4. This traditional concept was codified in some respects in the Aircraft Sabotage Act.

Section 32(a) proscribes destruction, bombing, and endangering the safety of any aircraft in the "special aircraft jurisdiction of the United States or any civil aircraft used, operated or employed in interstate, overseas or foreign air commerce." There are therefore two possible avenues for establishing jurisdiction under this section. The term "special aircraft jurisdiction" is defined to include "a civil aircraft of the United States" while that aircraft is in flight. 49 U.S.C. § 46501(2)(A). "Civil aircraft of the United States" is defined as "aircraft registered under chapter 441 of Title 49." 49 U.S.C. § 40102(17).

The indictment details a bombing plan by Defendants that targeted United States-flagged commercial airlines, all but one of which were bound for various cities in the United States. As part of the evidence in this case, the government will present a computer printout which it contends contains the specific flight numbers and itineraries for the aircraft involved. All the aircraft involved are from the fleets of well-known United States airline companies, which according to the government, were registered under chapter 441, making them "civil aircraft of the United States." Since the indictment alleges that the bombs were scheduled to explode while these civil aircraft were in flight, the

allegations satisfy the "special aircraft jurisdiction" provision.

The indictment also satisfies the other possible avenue of jurisdiction since it alleges that the aircraft involved were "civil aircraft used, operated or employed in interstate, overseas or foreign air commerce." "Civil aircraft" is also defined as any aircraft except a "public aircraft", which is defined as an aircraft used "exclusively in the service of any government...." *See* 49 U.S.C. § 40102(a)(16) & (37). "Foreign air commerce" is defined as "the transportation of passengers or property by aircraft for compensation ... between a place in the United States and a place outside the United States when any part of the transportation or operation is by aircraft." 18 U.S.C. § 40102(22). As already stated, all the aircraft involved in this plot were civil airliners and all but one were operating in routes between a United States city and a foreign city.

This court, therefore, has statutory jurisdiction over the substantive crimes charged in Counts Twelve, Thirteen, and Fourteen.

■ Murad also argues that this court does not have jurisdiction over Counts Fifteen and Sixteen, which charge him with participation in a conspiracy to kill a United States national abroad and a conspiracy to use a weapon of mass destruction against United States nationals, in violation of Sections 2332(b) and 2332a of Title 18. Murad challenges jurisdiction on the grounds that the indictment fails to indicate any evidence that Defendants' actions targeted specific nationals or property of the United States. (Murad Br. at 7–8).

As part of the overt acts listed in the indictment, the government alleges that Defendants were in possession of a letter that specifically threatened United States civilians. Additionally, all of the aircraft targeted in the alleged plot were United States carriers, and all but one were scheduled to make stops in the United States. At the very least, some members of the flight crew assigned to the various flights were United States nationals. The indictment therefore sufficiently alleges that United States nationals and other United States interests were targets of the alleged conspiracy.

■ Defendant Yousef challenges jurisdiction over Count Nineteen of the indictment, which concerns the Philippines airliner bombing. Section 32(b)(3), provides for criminal punishment of persons who place aboard a civil aircraft registered in a country other than the United States while that aircraft is in service, any device or substance which is likely to destroy or otherwise damage or endanger the aircraft's safety, provided the saboteur is later "found in the United States." 18 U.S.C. § 32(b)(3). Philippines Airlines Flight 434 was a civil aircraft registered outside the United States, which was en route from the Philippines to Tokyo, Japan when a bomb exploded on board, causing the death of one passenger, Haruki Ikegami, and injuring several others.

Yousef argues that he was not properly "found" within the United States as that term is used in section 32(b). Yousef argues that the sole reason he was present in the United States was because the government brought him to the United States to stand trial for the other charges in the indictment related to the bombing of the World Trade Center. Yousef argues that the government knowingly delayed indicting him on the airliner bombing plot until he was brought to the United States, in order to establish his presence in the United States for purposes of this count of the indictment. Therefore, according to Yousef, he was not present within the United States voluntarily, and jurisdiction cannot be asserted over him pursuant to Section 32(b).

The question of whether a defendant is "found" within the United States for purposes of establishing jurisdiction for aircraft-related crimes, where the defendant was brought to the United States to stand trial on other charges, was considered in *United States v. Yunis*, 924 F.2d 1086, 1089 (D.C.Cir.1991). There, the court held that jurisdiction was properly established under the Antihijacking Act, 49 U.S.C. § 1472(n), where the defendant was "found" within the United States as a result of his having been brought within the jurisdiction to stand trial for other charges contained in the same indictment.

In *Yunis,* the defendant was charged with hijacking an airplane that had two United States citizens aboard. The defendant in *Yunis* was apprehended by United States officials when they lured him aboard a ship in the Mediterranean Sea, and then sailed the ship into international waters. The defendant was then arrested on charges not including the hijacking charges and brought to the United States where he was eventually indicted for the hijacking. The D.C. Circuit held that once in the United States, and under arrest on other charges, he was properly indicted for the charges under the Antihijacking Act; thus jurisdiction was proper. The court stated "Congress interpreted the Hague Convention as requiring the United States to extradite or prosecute offenders in its custody, evidencing no concern as to how alleged hijackers came within U.S. territory." 924 F.2d at 1092.

Defendant Yousef was surrendered to United States officials by the Pakistani government pursuant to an extradition request made by the United States. Yousef was then returned to the Southern District of New York and subsequently indicted for the airliner bombing plot. These circumstances are at least as compelling as the facts presented in *Yunis.* The circumstances by which Yousef was "found" within the United States satisfy the statutory jurisdictional requirements.

■ Defendants Yousef and Shah argue that this court does not have jurisdiction based on principles of international law. Yousef argues that the only international law principle of jurisdiction applicable in this prosecution is that of universal jurisdiction. Yousef argues that "while courts have discussed universality as a basis of jurisdiction, in practice, it has never been used as the sole basis for the United States to assert jurisdiction over a defendant." (Yousef 11/1/96 Br. at 18) (emphasis in original).

The issue of exercising extraterritorial jurisdiction over a criminal prosecution based on universal jurisdiction was also discussed in *United States v. Yunis, supra.* Yousef attempts to distinguish *Yunis* from this case by arguing that in *Yunis,* the presence of two United States citizens aboard the hijacked plane provided an "independent basis for jurisdiction" over the defendant. (Yousef 11/1/95 Br. at 14).

The *Yunis* court did not decide that universal jurisdiction was insufficient as the sole basis for jurisdiction under the Antihijacking Act, but rather that the decision to exercise jurisdiction was bolstered by the fact that two of the passengers were United States citizens. The *Yunis* court held that the defendant had been "found" in the United States and therefore the prosecution satisfied the statutory jurisdictional requirements.

Endorsing the exercise of universal jurisdiction in the prosecution of an aircraft-related crime, the court stated that "aircraft hijacking may well be one of the few crimes so clearly condemned under the law of nations that states may assert universal jurisdiction to bring offenders to justice, even when the state has no territorial connection to the hijacking and its citizens are not involved." *Id.; see also United States v. Rezaq,* 899 F.Supp. 697, 709 (D.D.C.1995) ("the legislative history of the [Antihijacking Act] provides a strong indication that Congress indeed intended to provide extended criminal jurisdiction over extraterritorial hijacking offenses").

The court in *Yunis* cited to the Restatement (Third) of the Foreign Relations Law to support exercise of universal jurisdiction in a criminal prosecution related to crimes involving aircraft. Section 404 states, "[a] state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, *attacks on or hijacking of aircraft,* genocide, war crimes, and perhaps certain acts of terrorism, even where none of the other bases of jurisdiction indicated in § 402 is present." Restatement (Third) § 404 (1987) (emphasis added); *see also United States v. Georgescu,* 723 F.Supp. 912, 918 (E.D.N.Y.1989) (where the court recognized that "crimes committed aboard aircraft are considered both by the United States and the international community to be 'Offenses against the Law of Nations' ") (citations omitted).

The disregard for human life which would accompany the placing of a bomb aboard an airplane with the intent for that bomb to explode while the airplane is in flight and fully occupied with people, or otherwise sabotaging that plane, is at least as heinous a crime of international concern as hijacking a plane. The same rationale that supports jurisdiction under the Antihijacking Act also supports jurisdiction under the Aircraft Sabotage Act, regardless of where the alleged crimes occurred.

Moreover, contrary to Yousef's arguments, there is an additional basis for jurisdiction in this case. The indictment alleges that the bombing aboard the Philippines airliner was not an isolated incident, but part of a continuing course of conduct related to the alleged conspiracy to blow up United States airliners in East Asia. As discussed above, jurisdiction is properly alleged for those counts related to the conspiracy to blow up United States airliners, and therefore, jurisdiction is proper for acts committed in the continuous course of conduct of that conspiracy.

The exercise of extraterritorial jurisdiction in this case is reasonable, since the crimes charged have a "substantial, direct, and foreseeable effect" in the United States and clearly affect United States interests, as would be required by principles of international law. *See United States v. Javino*, 960 F.2d 1137, 1143 (2d Cir.1992) (quoting Restatement (Third) §§ 403(1) & (2)). The alleged crimes clearly had intended effects on the United States and its citizens, although they were committed abroad. The fact that the planned consequences of the plot did not come to fruition, and thereby did not directly injure any United States citizen, does not wrest jurisdiction over the prosecution from this court. *See United States v. Evans*, 667 F.Supp. 974, 980 (S.D.N.Y.1987) ("international law permits jurisdiction under ... theories [of extraterritoriality] even if the act or conspiracy at issue is thwarted before ill effects are actually felt in the target state"); *see also* Restatement (Third) § 402, Comment d ("When the intent to commit the proscribed act is clear and demonstrated by

some activity, and the effect to be produced by the activity is substantial and foreseeable, the fact that a plan or conspiracy was thwarted does not deprive the target state of jurisdiction to make its law applicable.").

The fact that the Philippines airliner bombing is a part of the continuous course of conduct charged against the defendants squelches Shah's argument that the prosecution of the defendants in the United States does not have a "territorial nexus or other direct nexus to the U.S.," rendering the prosecution "arbitrary and fundamentally unfair," and in violation of the Fifth and Sixth Amendments. Any constitutionally required nexus to the United States is clearly present.

■ Yousef, Murad, and Shah also challenge this court's jurisdiction under Counts Twelve, Seventeen, and Eighteen, on the grounds that the statutes upon which these counts rely do not contain specific grants of extraterritorial jurisdiction. Count Twelve charges a conspiracy under Section 371 to damage, destroy and bomb United States aircraft in the special aircraft jurisdiction of the United States. Counts Seventeen and Eighteen charge the defendants with using and carrying a bomb during and in relation to the conspiracy charged in Count Twelve and the conspiracy charged in Count Fifteen, respectively.

Extraterritorial jurisdiction over a conspiracy charge depends on whether extraterritorial jurisdiction exists as to the underlying substantive crime. *See United States v. Bowman*, 260 U.S. 94, 96, 43 S.Ct. 39, 40, 67 L.Ed. 149 (1922); *United States v. Cotten*, 471 F.2d 744 (9th Cir.), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973). Since this court has jurisdiction over the substantive Section 32 charges, jurisdiction over the conspiracy charged in Count Twelve is also proper.

■ The charge contained in Count Fifteen, a violation of Section 2332, which proscribes conspiracy to kill United States citizens *abroad*, clearly applies extraterritorially. Because the charges regarding the use and carrying of bombs charged in Counts Seventeen and Eighteen arise directly from the conspiracy offenses charged

in Counts Twelve and Fifteen, this Court has jurisdiction over Counts Seventeen and Eighteen as well.

### Conclusion

I find that exercising extraterritorial jurisdiction over Defendants Yousef, Murad, and Shah for the crimes charged in the indictment is consistent with the statutory requirements, principles of domestic and international law, and the United States Constitution. Defendants' motions to dismiss the indictment and its various counts for lack of jurisdiction are therefore denied.

SO ORDERED.